WILHELMINA C. WIETERS

*v.*

ISRAEL HART.

[Filed August 3d, 1904.]

H. was the physician, confidential friend and adviser of W., from whom he received $15,000, to be held in trust for her benefit. He used some of the money to pay bills for her; some he appropriated to his own use, and some he invested in a farm, and in machinery, stock and implements for operating it, taking title to the farm in the name of W. H. conducted the farm as if it were his own, operating it at a loss. W. also mortgaged the farm for $2,200, H. receiving the proceeds. Finally W. took possession of the farm and sold the stock, implements and machinery, and seeks an accounting from H.—*Held*, that H. is chargeable with the original $15,000, with interest, and the $2,200 raised on mortgage, with interest, but not with the income from the farm; and that he is entitled to credit for the cost of the farm and permanent improvements as of the time W. took possession, and for the moneys realized from the sale of the stock, machinery and implements, and also for all moneys paid to W. or for her use, not including any expenses of operating the farm.

On bill for an accounting.

*Mr. Frederick J. Faulks,* for the complainant.

*Mr. John Sykes* and *Mr. John T. Bird,* for the defendant.

BERGEN, V. C.

The bill in this case calls for an accounting by the defendant of the sum of $15,000, which in the answer and on the argument it is admitted the defendant held in trust for the complainant. In order to understand the nature of the trust and the disposition of the fund, as well as the relation of the parties, a brief reference to a portion of the testimony is necessary. The complainant's home was Charleston, South Carolina, until she was seven years of age, when she was placed by her father

at the Pennington seminary, in this state, where she remained until she was twenty years old, after which she continued to and still resides in the village of Pennington. Since she first came to the seminary she has been practically among strangers, so far as association with her relatives is concerned; her father, up to the time of his death, in 1890, when the complainant was twenty-five years of age, having visited her only about once in every four years, and she saw her brother about as often. When she was eleven years old she was afflicted with a very serious illness, during which her life was despaired of by the physician in charge. At this critical juncture the defendant, a practicing physician residing in Pennington, was called in, and under his treatment the complainant recovered from her then present illness, although it appears that she has since then suffered to a considerable extent from physical ailment. Ascribing her recovery to the defendant's skill, the complainant was very grateful to him, and thus was laid the foundation for the confidence and trust which the complainant ever after reposed in the defendant, a trust and confidence growing so implicit during the years of her minority, separated as she was from her parents and relatives, the usual source of advice, consolation and sympathy to which a young girl would apply, that her will was entirely subject to the will of the defendant; his advice she followed without question; his act she accepted as the best that could be done.

When the complainant was about twenty years of age she left the seminary, but remained in Pennington, and the confidential relations between the defendant and complainant were so close that nearly all, if not all, of the cost of her maintenance was remitted by her father to the defendant, who attended to the disbursement of it for her use.

In 1890 the complainant's father died, leaving her a legacy of $15,000, which was paid to her in May, 1891, by a check for that sum, less $18 cost of exchange; this check was at once endorsed to the defendant in trust for the complainant, and was by him deposited in bank to his individual credit. Within three days, as he testifies, this trustee drew $700 from the fund,

of which he used $378 to pay a board bill for the complainant, which had been allowed to accumulate in expectation of the receipt of the legacy; of the residue of this sum he retained $228, which he said was due—$73 for medical services, $50 for a nurse and $105 for going to New York and Philadelphia to see whether more money could not be had from the father's estate. There is nothing in the case to show that he expended $105 in these trips, and I do not believe he did. Besides these payments, he claims to have given the complainant $122. This is denied by her, and no voucher was produced to sustain the claim. I mention this for the purpose of showing that from the outset this defendant began to treat this fund as his own, and as indicative of his intended conduct with relation to it.

The next step taken by this trustee was the investment of $2,500 in one mortgage and $300 in another, both securities being taken in the name of the complainant. Following this, and on June 15th, 1901, he purchased with the trust money a farm, located between two and three miles from Pennington, for $6,024.70, and had the same conveyed to the complainant; and although possession of the farm was not to be had until the April following, the defendant began extensive improvements on the farm, the purchase of machinery, stock and other personal property for the purpose of conducting a farming business, and employed a tenant to work and manage the business, in consideration of one-third of the gross proceeds. In December, 1892, about nine months after the farming operations began, he informed the complainant that he needed more money, and induced her to sell the mortgage taken for $2,500, he taking the proceeds; and in August, 1893, he represented to the complainant that he needed more money, and procured her to sell the mortgage for $300, he taking the money, so that within fifteen months after he had taken charge of the trust fund all that remained was the farm and its stock. In January, 1894, he was again out of money, and at his solicitation the complainant mortgaged the farm for $2,000, he taking the money, and in 1899 another mortgage on the farm for $200 was executed at the solicitation of the defendant to pay foreclosure

costs and accrued interest on the $2,000 mortgage. It further appears that in January, 1900, the defendant informed the complainant that she was largely in his debt on account of the farm, and induced her to give to him her note for $275, and, on the same pretence, another note, on March 25th, 1900, for $175, and for the same reason, on May 5th, 1900, another note for $725, a total of $1,175, all of which defendant admits he used for his own purposes; that these notes were renewed from time to time, with small payments, until November, 1902, when the defendant neglected to make further payments and the complainant was obliged to arrange for their payment, the amount then due being $978.

In the autumn of 1902 the condition became apparent to the complainant. The rent of the house she lived in was unpaid, the notes above mentioned were maturing and had to be provided for, and for years she had not received enough from her investment to keep her in comfort, and becoming alarmed, sought the advice of others, which resulted in her taking possession of the farm and selling the stock, from which she realized $850. In the meantime the defendant was asked to account for the trust estate, and the accounts furnished being unsatisfactory the bill of complaint in this case was exhibited.

The defendant has annexed to his answer an account which is so involved and intricate that any ordinary examination of it fails to show its true condition, the final figures pretending to show that the defendant has paid out $1,339.52 more than he has charged himself with. It was, however, disclosed on the hearing that the complainant had assumed the payment of notes amounting to $978, for which no credit was given, being the amount due, in November, 1902, on the notes given by the complainant, amounting to $1,175, the proceeds of which the defendant had appropriated. Even if the defendant had vouchers for all he claims to have paid, the account is not such as he should present; pages are misplaced and accounts so intermingled that it will require a careful accountant to separate the items and place them in an intelligible shape.

The net result of the management of this trust is that this

trusting woman has been deprived of the patrimony left by her father for her support during life, except a farm mortgaged to the extent of $2,200, and which the testimony shows is not worth over $6,000, or a net of $3,800 remaining of the $15,000. From the proofs and admissions in the answer, we are justified in finding that an obligation rested upon the defendant to deal with the fund which came to his hands according to the confidence reposed in him by the complainant, and that he is subject to the equitable rules usually applied to those who accept the execution of a trust. I am satisfied that this defendant has not faithfully executed this trust, and that he should reimburse the complainant.

The claim made that the conduct of the defendant met the approval and consent of the complainant, and that she is estopped from now dissenting, does not appeal to my conscience or reason. She was so subject to the dominating will of the defendant that it was only necessary for him to advise and suggest in order to obtain her consent. This he knew, and it is not equitable to now allow him to escape the result of his misfeasance because she was too weak or relied upon his professed superior knowledge too strongly to resist his wishes. It is seldom the court is called upon to consider a case where the confidence of the *cestui que trust* was greater or where the circumstances required a more watchful care on the part of the trustee than the one under consideration, and all to the knowledge of the defendant.

His management of the trust calls for the severest condemnation. His duty was plain and simple, and that was to invest the fund in safe, interest-bearing securities, and not to put the fund at the risk of a business which all the evidence shows was of a precarious and uncertain character in 1891. If he did not know it, the slightest inquiry of those engaged in a like enterprise at that date would have put him in possession of the situation. All the testimony shows this. Nor do I give any force to the argument that because others had loaned $6,000 on a mortgage security encumbering this land, therefore the investment was a safe one, for common experience teaches us that when the

owner of a farm is ready to dispose of it for the mortgage debt, as in this case, it is usually because the debt equals, if not exceeds, the value of the land. This may not be the case in every instance, but when not so the reason for the exception can be made to appear, and there was no effort made to do so in this case. .

To what extent this defendant should be held liable has required the most careful thought, but after fully considering the evidence I have concluded that the account should be taken and the defendant required to indemnify the complainant upon the following principles: He is to be charged with the $15,000, and interest, from the time it came to his hands to the date of the accounting, to be hereafter provided for, and also with $2,200, the amount procured on the two mortgages on the farm, with interest, from the time it came to his hands; also with $978 assumed by the complainant, with interest from the date of assumption, which was some time in November, 1902. He is to be .credited with the cost of the farm and of the actual permanent improvements in building, fencing and repairs, but this credit is to be made as of November, 1902, when complainant took possession of the farm, and interest from that date only, because up to that time he had the possession of the farm, using it in carrying on the business of farming, in which, in my judgment, he was not authorized to engage, and, if conducted at a loss, he must respond for the amount of the loss.

It is clear, from the testimony in this cause, that the defendant conducted the farming business in the most careless manner, and without the slightest regard to the interest of the trust in his charge; his acts, as disclosed, show that he treated the business practically as his own, buying and selling as he chose; taking the proceeds from the farm, in many instances, for his personal use, and, so far as we can discover, never pretending to account for it. His claim that for the butter and other things taken by him from the farm he handed the money to the complainant, is denied by her; he has no vouchers and I do not give the slightest credit to his story on this subject. From the very outset it was plainly manifest that the business was a losing venture,

and even if justified in embarking in the enterprise, it was his duty, as a prudent man, as soon as he discovered the business was being conducted at a loss, to discontinue it and make the loss as small as possible. I therefore determine that as the business was followed at a loss, he is not to be charged with the proceeds from the farm, nor credited with any charges for moneys paid in carrying on the business, and in these payments shall be included the cost of all stock, implements, machinery and taxes paid, unless the account shall show taxes paid on the trust fund other than the farm. He is to be credited with $850, and interest from date of receipt by the complainant, proceeds of the sale of the machinery, stock and implements. As these were sold at public auction, on usual terms, it is a fair presumption that it represents the value of such articles, after the defendant's use for a period of at least ten years. In addition to the foregoing, the defendant will be credited with payments made to the complainant or for her account.

The defendant's account filed with his answer shows that these disbursements amount to $6,161.70, but the complainant vigorously disputes many of the charges, although the account was too lengthy to be fully considered on the hearing. The defendant will be credited on this branch of the account with all proper payments for which he can produce vouchers, or which are admitted. As to all others, the master will take the deposition of witnesses and report the same to the court. Interest will be allowed on payments made from date to time of accounting.

There should be a reference to a master to state an account on the foregoing principles and a decree that the defendant account to the complainant for whatever may be adjudged to be due after settlement of the account, and I will advise accordingly.